UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| POLICE PENSION FUND OF PEORIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAPELLA EDUCATION COMPANY, J. KEVIN GILLIGAN, and LOIS M. MARTIN,<br><br>Defendants. | ) | Civ. No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS**

## JURISDICTION AND VENUE

1. Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

3. Capella Education Company's ("Capella" or the "Company") principal executive offices are located at 225 South 6th Street, 9th Floor, Minneapolis, Minnesota 55402.

4. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

5. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Capella between February 16, 2010 and August 13, 2010, inclusive (the "Class Period"), against Capella and certain of its officers and/or directors for violations of the 1934 Act. These claims are asserted against Capella and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6. Capella is a national leader in online education and its wholly-owned subsidiary Capella University is a regionally accredited online university. Capella offers graduate degree programs in business, information technology, education, human services, psychology, public health, and public safety, and bachelor's degree programs in business, information technology, and public safety. These programs are designed to meet the needs of working adults.

7. During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, defendants failed to disclose that the Company had been engaging in abusive and fraudulent recruiting and financial aid lending practices, thereby increasing Capella's student enrollment and revenues. As a result of defendants' false statements, Capella common stock traded at artificially inflated prices during the Class Period, reaching a high of $97.58 per share on April 28, 2010.

8. Then on August 13, 2010, after the market closed, the U.S. Department of Education released data on student-loan repayment rates at the nation's colleges and universities. The data showed that repayment rates were 54% at public colleges and 56% at private non private intuitions, compared to just 36% at for-profit colleges. Specifically, the data showed that the repayment rates at Capella were a mere 40%.

9. On this news, the price of Capella stock dropped 13.19%, or $9.26 per share, from a closing price of $70.20 on August 13, 2010, to a closing price of $60.94 per share on August 16, 2010, the following trading day, on a 438% increase in trading volume.

10. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b) the Company failed to maintain proper internal controls;

(c) many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

11. As a result of defendants' false statements and omissions, Capella's common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately 37.5% from their Class Period high.

**PARTIES**

12. Plaintiff Police Pension Fund of Peoria purchased Capella common stock as described in the attached certification and was damaged when the revelations described herein reached the marker at the artificial inflation was removed from the price of Capella stock.

13. Defendant Capella is an online postsecondary education services company. Capella and its wholly-owned subsidiary Capella University are both headquartered in Minneapolis, Minnesota, and together employ more than 1,500 administrative staff and more than 1,100 faculty members.

14. Defendant J. Kevin Gilligan ("Gilligan") is, and at all relevant times was, Chief Executive Officer ("CEO") of Capella and was appointed to Chairman of the Board in 2010.

15. Defendant Lois M. Martin ("Martin") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Capella. During the Class Period, while Capella's stock price was artificially inflated, Martin sold 48,727 shares of Capella common stock at $83.43 per share, for insider trading proceeds of $4,065,294.

16. Defendants Gilligan and Martin (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Capella's quarterly reports, press releases and presentations to securities analysts, money and portfolio

managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

17. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Capella. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Capella common stock was a success, as it: (i) deceived the investing public regarding Capella's prospects and business; (ii) artificially inflated the prices of Capella common stock; and (iii) caused plaintiff and other members of the Class to purchase Capella common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Capella common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

19. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Capella has more than sixteen (16) million shares of stock outstanding, owned by hundreds if not thousands of persons.

20. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the 1934 Act was violated by defendants;

(b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the price of Capella common stock was artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

21. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

22. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

24. Capella is an online postsecondary education services company that was founded in 1991. Through its wholly-owned subsidiary, Capella University, the Company offers a variety of doctoral, master's and bachelor's programs. The Company is a national leader in online education, providing more than 1,050 online courses and 36 academic programs with 124 specializations to approximately 38,000 students. Students are currently enrolled from all 50 states and over 52 countries, with seventy-eight percent of all students pursuing master's or doctoral degrees.

25. As stated above, Capella offers graduate degree programs in the fields of business, information technology, education, human services, public health, public safety, and psychology, as well as bachelor's degree programs in the fields of business, information technology, and public safety. The Company also offers certificate programs, which consist of a series of courses focused on a particular area of study. In addition, Capella also offers academic services, such as new learner orientation, technical support, academic advising, research services (particularly for doctoral degree candidates), writing services and online tutoring. It also provides appropriate educational accommodations to learners with documented disabilities through its disability support services team.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

26. The Class Period begins on February 16, 2010. On that date, Capella issued a press release reporting fourth quarter and full year 2009 earnings results. The Company reported a 22.9% increase in revenues of $334.6 million, an increase in new enrollment of 37.5%, and net income of $42.7 million or $2.51 per weighted average number of diluted shares for the fiscal year ended December 31, 2009. The Company further reported net income of $15 million, or $0.88 diluted net income per share for the fourth quarter ended December 31, 2009.

27. On this news, the price of Capella stock rose 9%, or $6.41 per share, on February 16, 2010, to close at $76.96, on a 693% increase in trading volume.

28. On March 1, 2010, while the price of Capella common stock was artificially inflated, Martin sold 48,747 shares of Capella common stock at $83.43 per share, for insider trading proceeds of $4,065,294.

29. On April 27, 2010, the Company issued a press release reporting first quarter 2010 earnings results. The Company reported revenues of $101.2 million, an increase of 32.4%, a 32.1% increase in active enrollment, and net income of $15.2 million or $0.89 per weighted average number of diluted shares outstanding for the quarter ended March 31, 2010.

30. On June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee, announced that he would be holding a series of hearings to examine federal spending at for-profit colleges. The press release provided in pertinent part:

> Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.
>
> "In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."
>
> Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.
>
> The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

31. On June 16, 2010, the U.S. Department of Education announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices.

32. On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education."

33. On July 27, 2010, the Company issued a press release reporting second quarter 2010 earnings results. The Company reported revenue of $105.2 million, an increase of 31.3%, a 32.1% increase in total enrollment, and net income of $14.6 million, or $0.86 per weighted average number of diluted shares outstanding for the quarter ended June 30, 2010.

34. On August 3, 2010, news began to leak into the market concerning the findings from an undercover operation conducted by the U.S. Government Accountability Office ("GAO") on recruiting techniques used in the for-profit higher education industry.

35. As a result, on August 3, 2010, Capella stock declined 4.86%, or $4.54 per share, from a closing price of $93.48 on August 2, 2010, to a closing price of $88.94 on August 3, 2010. As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on Capella's business and prospects, Capella stock continued to decline.

36. For example, on August 3, 2010, the *New York Times* published an article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part, as follows:

> Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.
>
> The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was “not the government’s business.” At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered “zero” when asked about money he had in savings — and then told him she would “correct” his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed

37. On August 4, 2010, the GAO issued its report detailing its findings. At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices. The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry – such as Capella – employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling. The study was presented at a Senate education hearing held on August 4, 2010 as part of its ongoing inquiry into the for-profit sector. This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."

38. On August 6, 2010, Capella filed a form 8-K, announcing that the Company received a request from the U.S. Senate Committee on Health, Education, Labor and Pensions relating to for-profits colleges and financial aid. The Company stated, as follows:

> Today, Capella Education Company (the "Company") announced that it has received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions relating to the Committee's ongoing hearings relating to for–profit colleges receiving Title IV student financial aid.
>
> It is the Company's understanding, based on communication from Senator Harkin, chairman of the Committee, this request was extended to 30 proprietary educational institutions.
>
> The request seeks information to more accurately understand how the Company uses Federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The request also seeks an understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window.
>
> In furtherance of this, the Committee has requested that the Company provide information about a broad spectrum of the Company's business, including detailed information relating to financial results, management, operations, personnel,

> recruiting, enrollment, graduation, student withdrawals, receipt of Title IV funds, institutional accreditation, regulatory compliance and other matters. The Company intends to cooperate with the Committee and to work with the Committee to provide the requested information in a manner that does not compromise the Company's sensitive proprietary operating and other information.
>
> The Committee has requested that the Company produce a portion of the specified information by August 26, 2010 and the remainder of the information by September 16, 2010.

39. In response to this negative announcement, the price of Capella stock dropped 6.65%, or $5.70 per share, to close at $80.03 on August 6, 2010.

**The Truth Is Revealed**

40. On August 13, 2010, after the market closed, the U.S. Department of Education released data on student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private nonprofit institutions and 36% at for-profit colleges. The data showed the repayment rates at Capella's schools were just 40%.

41. In addition, the U.S. Department of Education proposed new regulations for programs to continue to be eligible to receive federal financial aid. The tests for eligibility would be based on repayment rates and debt-to-income loads. Under the proposed "gainful employment" regulations, programs would need to have a repayment rate of at least 45% to continue to be eligible for federal financial aid. The regulations if adopted will go into effect in July 2011. Based on the proposed regulations, many of Capella's programs are in jeopardy of losing their financial aid status.

42. On this news, the price of Capella's stock plummeted an additional $9.26, or 13.19% per share, from a closing price of $70.20 on August 13, 2010, to a closing price of $60.94 on August 16, 2010, the next trading day, on a 438% increase in trading volume.

43. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b) the Company failed to maintain proper internal controls;

(c) many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

44. As a result of defendants' false statements and omissions, Capella common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately 37.5% from their Class Period high.

**Additional Scienter Allegations**

45. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Capella, their control over, and/or receipt and/or modification of Capella allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Capella, participated in the fraudulent scheme alleged herein.

46. During the Class Period, the artificially inflated price of Capella common stock directly benefited Martin, who sold 48,727 shares of stock for $83.43 per share, and received insider trading proceeds of $4,065,294.

**LOSS CAUSATION/ECONOMIC LOSS**

47. During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Capella common stock and operated as a fraud or deceit on Class Period purchasers of Capella common stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Capella common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Capella common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

**NO SAFE HARBOR**

48. Capella's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

49. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Capella who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

50. Plaintiff incorporates ¶¶1-49 by reference.

51. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Capella common stock during the Class Period.

53. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Capella common stock. Plaintiff and the Class would not have purchased Capella common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

54. Plaintiff incorporates ¶¶1-49 by reference.

55. The Individual Defendants acted as controlling persons of Capella within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Capella common stock, the Individual Defendants had the power and authority to cause Capella to engage in the wrongful conduct complained of herein. Capella controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages, including interest;

C. Awarding plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 5, 2010

REINHARDT, WENDORF & BLANCHFIELD

s/Garrett D. Blanchfield
GARRETT D. BLANCHFIELD

GARRETT D. BLANCHFIELD
Bar No. 209855
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone: 651/287-2100
651/287-2103 (fax)
g.blanchfield@rwblawfirm.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID J. GEORGE
ROBERT J. ROBBINS
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

***Attorneys for Plaintiff***

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

POLICE PENSION FUND OF PEORIA ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of Nov, 2010.

POLICE PENSION FUND OF PEORIA

By: Joseph P. Spears

Its: President



CAPELLA

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/15/2010 | 1,200 | $85.73 |