## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Oklahoma Firefighters Pension and Retirement System, | Civil No. 10-4474 (SRN/SER) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Capella Education Company, J. Kevin Gilligan, Lois M. Martin, and Amy L. Ronneberg, | |
| Defendants. | |

---

Ian D. Berg, Mitchell M.Z. Twersky, and Ximena R. Skovron, Abraham, Fruchter & Twersky, LLP, One Penn Plaza, Suite 2805, New York, NY 10119; and Vernon J. Vander Weide, Lockridge Grindal Nauen, P.L.L.P., 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for Plaintiff.

Wendy J. Wildung, Faegre & Benson LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the motion to dismiss brought by Defendants Capella Education Company, J. Kevin Gilligan, Lois M. Martin, and Amy L. Ronneberg. (Doc. No. 45). For the reasons stated below, this Court grants the motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In this securities fraud action, Lead Plaintiff Oklahoma Firefighters Pension and Retirement System claims that Defendant Capella Education Company, and three of its officers–(1) Defendant J. Kevin Gilligan, Capella's Chief Executive Officer, (2)

Defendant Lois M. Martin, Capella's Chief Financial Officer and Senior Vice President, and (3) Defendant Amy L. Ronneberg, Capella's Vice President and Controller (collectively, the "Individual Defendants")–violated the Securities Exchange Act of 1934 and related regulations issued by the Securities Exchange Commission ("SEC").

Capella is a for-profit, on-line university that receives a significant portion of its revenue–"approximately 78%"–from tuition financed by government loans. (Doc. No. 41, ¶¶ 2, 4.) In 2006, the federal government first allowed online, for-profit institutions to participate in federal financial aid programs under Title IV of the Higher Education Act of 1965 ("HEA"). (Id. ¶ 4.) In order to remain eligible for such funding, Capella must maintain compliance with applicable regulations promulgated by the United States Department of Education ("DOE"). (Id. ¶ 5.)

Federal law prohibits institutions such as Capella from making any false, erroneous, or misleading statement regarding the nature of its educational program, its financial charges or the employability of its graduates to any student or prospective student. (Id. ¶ 33.) Such institutions must also provide an accurate description of the complete costs of attending the institution. (Id.) In addition, at least with respect to most educational programs, such institutions must prepare students for "gainful employment in a recognized occupation." (Id. ¶ 5.)

On May 26, 2009, the DOE published a notice of its intent to establish a negotiated rulemaking committee to consider changes to the rules regarding federal financial aid programs. (Id. ¶ 37.) At issue was incentive compensation paid to student recruiters and

an institution's record of placing graduates in gainful employment.  (Id.)  On May 29,

2009, the Deputy Undersecretary for the DOE reported during a conference call that the

DOE was considering reversing the "safe harbor" provision related to the ban on

incentive compensation and adding standards that graduates find "gainful employment" in

their field of study.  (Id. ¶ 38.)[1]

During the time DOE officials met with industry representatives, the DOE focused

on developing certain thresholds to demonstrate "gainful employment."  To be eligible for

federal student aid, the DOE was considering requiring a program to meet one of two

thresholds:  (1) a loan repayment rate of 90%, with loans not considered to be in

repayment if they were delinquent, in default, in deferment, or in forbearance; or (2)

certain debt-to-income ratios.  (Id. ¶ 40.)  The DOE was also considering eliminating the

"safe harbor" exceptions to the ban on incentive-based compensation for admissions and

financial aid personnel.  (Id. ¶ 41.)

In June and July of 2010, the DOE issued proposed regulations for public

comment.  With respect to the ban on incentive compensation for admissions and

financial aid personnel, the proposed rule removed all of the "safe harbor" provisions.

(Id. ¶ 42.)  With respect to the gainful employment requirement, programs would remain

fully eligible to receive Title IV funds if at least 45% of the principal of former students'

loans was being paid down, or if graduates had debt-to-income ratios of less than 20% of

---

[1]      The safe harbor permitted such compensation essentially as long as the
incentives were "not based solely on the number of students recruited, admitted, enrolled,
or awarded financial aid."  34 C.F.R. § 668.14(b)(22)(ii)(A).

discretionary income or 8% of total income.  (Id. ¶ 43.)  A program would be completely

ineligible for Title IV funds if the repayment rate by its graduates was less than 35%, or if

their debt-to-income ratios were greater than 30% of discretionary income or 12% of total

income.  (Id.)  A program with students falling in between these two ends of the spectrum

would be subject to restrictions on its eligibility for federal funds.  (Id.)

In the interim, the GAO was conducting undercover investigations of the

admissions procedures and standards at fifteen for-profit schools other than Capella.  The

Complaint alleges that the "[t]he truth [regarding Capella's alleged omissions] was

revealed between August 3rd and August 16th, 2010," beginning with the GAO's issuance

of its report "identifying widespread recruiting and enrollment practices at for-profit

institutions–such as those [allegedly] engaged in by Capella."  (Doc. No. 41, ¶ 12.)  The

GAO's report, issued on August 4, 2010, identified deceptive enrollment practices and

received substantial media attention.  (Id. ¶ 163.)  Although Capella was not named as

one of the fifteen schools investigated, the stock prices of many for-profit schools,

including Capella, fell when it was reported that the abusive practices were widespread

throughout the industry.  (Id. ¶¶ 163-66, 168, 170, 172.)  And a committee of the U.S.

Senate, which had been conducting hearings regarding for-profit schools, took testimony

about the GAO report.  The committee then requested documents from thirty publicly-

traded for-profit schools, including Capella.  (Id. ¶ 173.)  On September 30, 2010, the

committee released a report criticizing the number of students who dropped out of the

programs at issue, but not naming Capella.

The price of Capella's common stock fell with each event. "In reaction to the disclosures made between August 3rd and August 16th, 2010, the price of Capella stock decreased by 34.8% from a closing price of $93.48 on August 2, 2010 to close at $60.94 on August 16, 2010." (Id. ¶ 14.) In particular, on Friday August 13, 2010, after the markets closed, the DOE released data on the loan repayment rates for more than 8,000 post-secondary schools, including Capella, showing that the repayment rate by Capella's students was only 40%. That day, shares of Capella's stock declined by $9.26, or over 13%, on high trading volume. (Doc. No. 41, ¶¶ 176, 201.) The following Monday, August 16, 2010, the price fell over 13%, or $9.26 per share. (Id. ¶ 201.) The price did not recover and the stock traded at about $44.00 when the Amended Class Action Complaint was filed in late June 2011. (Id. ¶ 14.)

On June 27, 2011, Plaintiff filed the Amended Complaint ("Complaint"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(b), and the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5.[2] Seeking class certification on behalf of all persons similarly injured by acquiring Capella securities, Plaintiff alleges a Class Period from July 28, 2009 to August 16, 2010 (inclusive), just after the DOE's release of data showing the overall repayment rate on government loans taken by students at for-profit schools, including Capella.

Plaintiff alleges that Defendants made materially false and misleading statements

---

[2]     The original Complaint was filed on November 5, 2010 by a different investor in Capella's stock. After the Oklahoma Firefighters Pension and Retirement System was named Lead Plaintiff, it filed the Amended Class Action Complaint.

and omissions regarding matters such as (1) Capella's recruiting and enrollment practices, (2) Capella's incentive compensation system, and (3) Capella's failure to disclose the loan repayment rates of its graduates.  (Id. ¶ 10.)  Plaintiff contends that Defendants, in order to increase revenues by increasing enrollments, "instituted abusive recruiting and enrollment practices," including quotas, repetitive cold calling, spam emails and an improper compensation system.  (Id. ¶¶ 51, 52.)  Plaintiff alleges that due to the new scheme, "Capella's enrollments grew by over 26% in 2009, and its revenues also grew by over 23%."  (Id. ¶ 7.)

Plaintiff further alleges that Defendants "continually misrepresented the impact of the regulatory changes" being considered by the DOE before and throughout the Class Period.  (Id. ¶ 87.)  "Defendants repeatedly stated that Capella would be able to comply with the elimination of the 'safe harbors' yet concealed the fact that its current compensation system was actually in violation of the current ban on incentive compensation, including the 'safe harbors,' and would continue to be in violation once the 'safe harbors' were removed."  (Id.)

"Defendants Gilligan and Martin repeatedly stressed Capella's low cohort default rates to suggest that Capella's repayment rates were correspondingly high and, thus, exceeded a 90% threshold," but "misleadingly failed to disclose" that "cohort default rates are in no way comparable to repayment rates," as cohort rates measure only outright default, while repayment rates also exclude loans that "are in deferment, forbearance, delinquent or are otherwise not being repaid."  (Id. ¶ 89.)  And even before the DOE

6

disclosed it was considering "a 90% repayment rate as a threshold, [D]efendants should have but failed to, disclose Capella's 40% repayment rate." (Id. ¶ 90.)

Furthermore, Plaintiff alleges, "Capella inflated its revenues by failing to properly account for student withdrawals" caused by Capella's emphasis on "enrollment without regard to the quality of the applicants or their ability to actually complete the online curriculum." (Id. ¶ 92.) Plaintiff contends that Defendants overstated revenue by (1) recognizing as revenue all of the tuition for courses from which students withdrew early, in which case Capella was required to refund either 75% or 100% of the tuition, and (2) "by improperly manipulating the effective dates of students' withdrawals" so as to be able to keep all of the tuition they paid. (Id. ¶¶ 93, 94 ("Under Title IV regulations, if a student withdraws after 60% of the course has been completed, then the institution has 'earned' 100% of the Title IV funds and is entitled to keep them.").) Thus, "Capella materially overstated its revenues" by hiding its "fraudulent scheme from investors, by, among other things, concealing a key metric from" them: instead of disclosing student withdrawal rates, "Capella continuously touted its high number of enrollments and its high enrollment growth rates." (Id. ¶ 99.)

Plaintiff also alleges that all of Capella's financial statements issued during the Class Period "were materially false and misleading because they failed to comply with SEC rules and GAAP." (Id. ¶ 100.) Finally, Plaintiff contends that Defendants failed to maintain proper internal controls over financial reporting. (Id. ¶¶ 110-13.)

Defendants now move to dismiss.

## II.     DISCUSSION

Plaintiff's Complaint asserts two claims:  (1) a claim under Section 10(b) and Rule 10b-5 against all of the Defendants, alleging that Defendants made false statements of material fact that deceived Plaintiff (Count I); and (2) a derivative claim under Section 20(a) against the Individual Defendants, alleging that they were liable as "control persons" under the Exchange Act (Count II).  (Doc. No. 41, ¶¶ 204-14.)

Defendants argue that the allegations of the Complaint fail to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1985 ("PSLRA"), Pub. L. 104-67, 109 Stat. 743, 758 (codified at 15 U.S.C. § 78u-4), with respect to the identification of false or misleading statements and the requisite state of mind, as well as other legal requirements for pleading securities fraud claims, particularly with respect to loss causation.

### A.     Dismissal Standard

The Court accepts as true the factual allegations of the Complaint and draws all reasonable inferences in Plaintiffs' favor, but does not defer to any legal conclusions or formulaic recitations of the claims' elements.  Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th Cir. 2011).  Under Rule 12(b)(6), the Complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. ___, ___ (2009)).  Plausibility turns on whether the facts alleged allow the Court to draw the reasonable inference that the Defendants are liable for the alleged misconduct.  Id.

In addition to these general pleading standards, the PSLRA imposes a heightened pleading standard in securities fraud actions with respect to certain elements of securities fraud claims.[3]  "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).[4]  The intent of the PSLRA was to "'put an end to the practice of pleading fraud by hindsight.'"  Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008) (quoting In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002)).  Thus, to survive a motion to dismiss, a securities fraud complaint must point to "contemporaneous reports, witness statements, or any [other] information that had actually been provided to defendants" at the time they were alleged to have misrepresented material facts.  Id.

---

[3]     The heightened pleading standards imposed by the PSLRA are confined to the two components of falsity and scienter and do not apply to the issues of materiality and loss causation.  Gebhardt v. Conagra Foods, Inc., 335 F.3d 824, 830 n.3 (8th Cir. 2003).

[4]     With respect to pleading misleading statements and omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  With respect to pleading the required state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2)(A).

**B.      Count I:  The Section 10(b) and Rule 10b-5 Claim**

With respect to the primary claim of liability under Count I, the Complaint

essentially alleges that Defendants, in violation of Section 10(b) and Rule 10b-5,

"disseminated or approved" statements that "they knew . . . were materially false and

misleading," or recklessly disregarded their falsity and misleading nature, "in that they

contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading."  (Doc. No. 41, ¶¶ 207.)  Section 10(b)

> makes it unlawful for any person to "use or employ, in connection with the
> purchase or sale of any security . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the [Securities
> Exchange] Commission may prescribe as necessary or appropriate in the
> public interest or for the protection of investors."

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011) (quoting 15 U.S.C. §

78j(b)).

> SEC Rule 10b-5 implements this provision by making it unlawful to, among
> other things, "make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements made, in the
> light of the circumstances under which they were made, not misleading."

Id. (quoting 17 C.F.R. § 240.10b-5(b)).

At the pleading stage, a plaintiff asserting liability under Section 10(b) and/or Rule

10b-5 must satisfactorily allege "'(1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

economic loss; and (6) loss causation.'" <u>Minneapolis Firefighter Relief Ass'n</u>, 641 F.3d

at 1028 (quoting <u>Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.</u>, 552 U.S. 148, 157

(2008)).

The thrust of Plaintiff's Complaint is that Capella, starting in March 2009 under

the new leadership of CEO Gilligan and his management team, "improperly sought to

exploit the availability of Title IV funding by engaging in a series of abusive and

deceptive recruiting and enrollment practices designed to inflate enrollments – and

thereby increase access to Title IV funds – without regard to students' welfare, their

ability to complete a postsecondary education, or their understanding of the true costs

they were incurring."  (Doc. No. 41, ¶ 6.)  "[W]here previously Capella was student-

focused with an emphasis on enrolling qualified students, the focus at Capella under

Defendant Gilligan's management changed to a high-pressure, quota-driven recruiting

and enrollment 'factory.'"  (<u>Id.</u> ¶ 7.)  Moreover, Capella did not disclose to investors that

it had begun aggressive recruiting of unqualified students in order to secure government

guaranteed student loan funding, which comprised about 78% of Capella's revenue.  (<u>Id.</u>;

<u>accord id.</u> ¶¶ 59-60.)

In response, Defendants argue that the drop in Capella's stock price results not

from securities fraud, but from investors' reaction–perhaps overreaction–to the DOE's

development, from May 2009 through early June 2011, of new regulations under Title IV

governing an educational institution's eligibility for federal student loans and grants.

(Doc. No. 46, at 4.)  In early August 2010, news reports about a Government

Accountability Office (GAO) investigation of some for-profit schools, other than Capella, "scared the market," according to Defendants, such that investors' fear that the government would "over-regulate" all for-profit schools caused an industry-wide fall in stock prices, including that of Capella. (Id. at 4-5.) They now seek dismissal, contending that the allegations of the Complaint (1) fail to identify the false statements, and fail to plead the alleged materiality and falsity of the statements at issue, (2) do not support the requisite inference of scienter, and (3) fail to plead loss causation. (Id. at 5.) They further argue that the Section 20(a) claim must also be dismissed because it is derivative of the Section 10(b) claim. (Id. at 37-38.)

### 1.    Material Omissions or Misrepresentations

A viable securities fraud claim under Section 10(b) and/or Rule 10b-5 first requires that Defendants made a material misstatement or omission–that "the defendant made a statement that was '*misleading* as to a *material* fact.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011) (emphasis in original) (internal citation omitted). To be material, the statement must create "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).

> Material information is that which "would have assumed actual significance in the deliberations of the reasonable shareholder." This determination requires "delicate assessments of the inferences a 'reasonable shareholder'

> would draw from a given set of facts and the significance of those inferences to him."

In re: K-Tel Int'l, Inc. Sec. Litig. 300 F.3d 881, 897 (8th Cir. 2002) (internal citations omitted).  "In contrast, a fact is immaterial '[w]here a reasonable investor could not have been swayed' by the misrepresentation."  Id.  And

> some statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them.  "The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time."  [Thus,] "soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.  No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market."

Parnes, 122 F.3d at 547 (internal citations omitted), cited in Hutchinson, 536 F.3d at 960-61.

With respect to pleading falsity, the "PSLRA's heightened pleading requirements compel the plaintiff to 'plead the 'who, what, when, where and how' of the misleading statements or omissions.'"  In re 2007 Novastar Financial, Inc. Sec. Litig., 579 F.3d 878, 882 (8th Cir. 2009).  "To meet the falsity requirement, a complaint must not only indicate that false statements were made, but must indicate why the alleged misstatements were false when made."  Lustgraaf v. Behrens, 619 F.3d 867, 874 (8th Cir. 2010).  Accord In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005).  And although, absent a duty to disclose, silence is not misleading, once a party discloses material facts, a duty arises to speak fully and truthfully on those subjects.  In re: K-Tel Int'l, Inc. Sec. Lit., 300

13

F.3d 881, 898 (8th Cir. 2002).  In other words, the law requires an actor to provide

complete and non-misleading information with respect to the subject on which he

undertakes to speak.  Id.

Here, Plaintiff asserts that "Defendants misled the market about the reasons

behind, and sustainability of, Capella's financial performance and enrollment growth" by

omitting material facts regarding the real basis for its performance and instead attributing

that success to factors such as (1) "strong demand fundamentals and solid execution," (2)

"the strength of [Capella's] competitive position", and (3) its "very high quality learner

base."  (Doc. No. 53, at 15.)  Thus with respect to the bulk of the statements at issue here,

Plaintiff's theory of the case is not so much that what Defendants said was itself false, but

that such statements were misleading because they omitted information that investors

would have found material.[5]  In particular, the Complaint alleges that Defendants

---

[5]      Plaintiff identifies five groups of statements it alleges were false or
misleading:  (1) statements regarding Capella's 2Q09 financial results; (2) statements
regarding Capella's 3Q09 financial results; (3) statements regarding Capella's 4Q09 and
2009 annual financial results; (4) statements regarding Capella's 1Q10 financial results;
and (5) statements regarding Capella's 2Q10 financial results.  With respect to each of the
five groups of statements at issue, the Complaint explains that the statements were false
or misleading because:  (1) Capella's enrollment and revenue figures were inflated due to
its recruiting and enrollment practices; (2) the statements failed to disclose as much, and
those practices violated federal law, thereby jeopardizing Capella's ability to maintain its
primary source of revenue, that is, student loans; (3) the same failures jeopardized its
ability to remain an accredited institution; (4) Defendants' discussion of the factors
purportedly behind Capella's success failed to disclose its enrollments were inflated due
to the alleged practices at issue; (5) the figures Capella reported were overstated as a
result of the failure to disclose student withdrawal rates; and / or (6) the statements failed
to disclose Capella's 40% student loan repayment rate and the consequences under the
proposed "gainful employment" regulations.  (Doc. No. 41, ¶¶ 116, 129, 142, 151, &
(continued...)

attributed Capella's growth to factors *other than* the undisclosed new recruiting and

enrollment practices that Plaintiff alleges generated the seemingly positive results.

Plaintiff asserts that Defendants misled the market "about the reasons behind, and

sustainability of, Capella's financial performance and enrollment growth" by attributing

that success to such factors as "strong demand fundamentals," the strength of Capella's

"competitive position," its "solid execution," and the high quality of its students.  (Doc.

No. 53, at 15.)  Plaintiff contends that the statements at issue were misleading because

Defendants omitted material facts that Capella's enrollment growth was in fact based on:

(1) improper compensation of enrollment staff in violation of existing DOE regulations;

(2) use of aggressive telemarketing practices that resulted in the enrollment of unsuitable

students; and (3) abusive and deceptive recruiting and enrollment practices regarding

matters such as the true costs of academic programs.  (Doc. No. 53, at 15-16.)

As Plaintiff contends, "Defendants made positive statements about Capella's

revenue and enrollment growth without disclosing the key reasons for" that growth–its

new strategy of "improper recruiting and enrollment practices"–and thereby "misled

investors as to the true reasons for Capella's financial performance, as well as the

sustainability of its financial performance going-forward."  (Doc. No. 53, at 18.)  For

example, while Gilligan attributed Capella's results for the third quarter of 2009 to

various factors, he did not disclose "that he implemented new procedures that more

---

[5](...continued)
162.)  In effect, each of the five sets of statements shares the same alleged deficiency of
omission.

aggressively sought increased enrollments, at the expense of enrolling quality students."
(Id. at 19.)

Apart from the host of individual arguments asserted by Defendants, the Court
discerns a more fundamental problem with the Complaint.  Plaintiff's theory of the
case–that Defendants' omissions regarding the basis for Capella's success under Gilligan
misled investors–fails to articulate a plausible claim of securities fraud.  At bottom, such a
claim requires that a defendant's statement–or, as more relevant here, omission–misled
investors about the true basis of the company's financial position as reflected in its stock
price.  According to Plaintiff, investors in Capella's stock would have made different
decisions with respect to the purchase or sale of shares had Defendants disclosed the
allegedly aggressive and abusive recruiting practices newly instituted under Gilligan's
tenure.  But even accepting Plaintiff's allegations that those practices were overly
aggressive and abusive, there is no plausible theory that Defendants' actions, had they
been timely disclosed, would have made a difference with respect to investors' decisions.

Granted, if Capella misled prospective or existing students by misrepresenting the
costs of its programs, its graduation rates, or the likelihood of achieving gainful
employment rates upon graduation, those students might have a valid claim for
misrepresentation.  In re ITT Educational Services, Inc. Sec. and Shareholder Derivatives
Litig., ___ F. Supp. 2d ___, 2012 WL 1632762, *7 (S.D.N.Y. May 4, 2012) ("These
allegations, if true, might establish a strong claim for a dissatisfied student to bring
against [the school].").  But that does not necessarily translate to a shareholder's claim for

securities fraud.  Id. (dismissing action despite recognition of defendant's recruiting and enrollment practices).[6]

The allegations at issue here are remarkably similar to those in In re ITT Educational Services, Inc.  There, the plaintiff alleged that the school engaged in

> four types of fraudulent misrepresentations: (1) misleading statements regarding recruitment and enrollment growth; (2) misleading statements regarding [the school's] business focus; (3) misrepresentations of [the school's] graduate placement rate; and (4) misleading assurances regarding legal compliance.

Id. at *5.  There, too, the plaintiff alleged that the school "'operated a systemically predatory business model that relied upon deceit, manipulation, lies, and outright fraud' to enroll as many students as possible in order to maximize [the school's] federal Title IV funding."  Id.

### (a)  Capella's Recruiting and Enrollment Practices

But as the ITT court concluded with respect to the first type of allegedly fraudulent misrepresentations, "there is no direct connection between Defendants' statements regarding the sources of its revenue and enrollment growth and the omitted information regarding [the school's] predatory recruitment practices or quota system."  Id. at *6.  The defendant's statements regarding the basis for the school's success "are not misleading

---

[6]  Allegations that a securities fraud defendant engaged in unsavory or abusive practices, however reprehensible, does not necessarily provide a valid basis under the PSLRA for a valid claim of securities fraud.  Although the Court does not condone such actions, it reiterates that such claims must be premised on a material misrepresentation to investors, that is, a false or misleading statement or omission that would have made a difference in a reasonable investor's decision to buy or sell the security.

because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring." Id. "At most, Plaintiff alleges that a material number of [Capella's] students were victims of [Capella's] predatory recruitment practices, and thus a material portion of [Capella's] revenue came from this undisclosed 'source.' This is too tenuous a connection to render [Defendants'] statements regarding its financial success misleading." Id.

Here, if Defendants had disclosed that they had instituted under Gilligan a more aggressive recruiting and enrollment strategy, the Court fails to see how current or prospective investors would have likely made different decisions. Investors already knew that Capella was a for-profit educational institution and that much of its revenue, which presumably consisted almost entirely of tuition, was derived from federal financial aid programs. And there is nothing surprising, much less fraudulent or otherwise illegal, in the fact that a successful business aggressively markets its goods or services.

Moreover, the Complaint alleges that to conceal from investors the increased number of early student withdrawals resulting from its new "business model," Defendants improperly recognized revenues from tuition that it was required to refund when students withdrew early. And "[w]hile defendants may have accounted for these revenues by making an allowance for bad debt expense, Capella did not disclose that that was the case." (Doc. No. 41, ¶ 93.) But the Complaint fails to plausibly connect this "bad debt expense" theory with the allegedly fraudulent actions that it attributes to Gilligan's management team. Plaintiff alleges that "between 2007 and 2010, Capella's bad debt

18

expense grew steadily, from $3.6 million [in 2007] to $8.7 million in 2010." (Id.)  But

the Class Period extends only from July 28, 2009 through August 16, 2010.  (Id. ¶ 26.)

And, of course, Plaintiffs attribute Capella's change of course in terms of its recruiting

and enrollment practices to Gilligan's new management team that did not take over until

March 2009.  But if Capella's bad debt expense had been growing "steadily" from 2007,

and it allegedly totaled $5,225,000 for 2008, it is difficult, if not impossible, to discern the

necessary connection between the improper accounting for revenues that Capella could

not retain and the allegedly fraudulent non-disclosure of that practice that apparently

began no earlier than March 2009.

The Court also notes that Plaintiff alleges that Capella's "massive 'churn and burn'

scheme" was exposed by a compliance audit conducted by the Office of the Inspector

General ('OIG') for 2002-03 through 2007-08," which concluded that Capella had failed

to return to the DOE substantial Title IV funds that could not be retained by Capella due

to early student withdrawals.  (Doc. No. 41, ¶ 9.)  The audit, which began in April 2006,

was concluded by March 2008, when the OIG issued its final report.  (Id. ¶ 95.)  Again, it

is difficult to discern the relevance of whatever accounting irregularities Capella might

have engaged in prior to the Class Period, and prior to Gilligan assuming the position of

CEO.  And insofar as the OIG's report was public, the problem of substantial early

withdrawals–and its effect on Capella's bottom line–would have been readily available to,

if not actually known by, investors.  If anything, such allegations only undermine

Plaintiff's theory that the newly-instituted practices of overly aggressive and abusive

practices under Gilligan's management were the means by which Capella generated revenue growth.

### (b)    Capella's Placement Rates

With respect to the second type of allegedly fraudulent misrepresentations, that is, those regarding the school's employment placement rate, the court in <u>ITT Educational Services</u> noted that "[b]ecause placement rates are not directly related to revenue, Plaintiff must show an especially egregious discrepancy between [the school's] disclosed rate and its actual rate" for any misrepresentation to be material to investors.  <u>Id.</u>  Here, too, the allegations fail to satisfactorily plead that an accurate disclosure would have had a substantial likelihood of significantly altering the total mix of information available to a reasonable investor.  <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1301, 1309 (2011).

### (c)    Capella's Purported Focus On Students

With respect to the third type of allegedly fraudulent misrepresentations, that is, those regarding the school's purported "business focus" on student outcomes, the <u>ITT</u> court found the statements to be inactionable puffery.  2012 WL 1632762, at *7.  Here, too, for example, Defendant Martin stated that Capella's "very strong results" for the quarter and "optimism" for the future "validate our strategy to focus on our learners, educational quality and excellence in operations to deliver against our financial goals." (Doc. No. 41, ¶ 118.)  Even if such statements are not too vague or such obvious hyperbole and corporate cheerleading, they suffer from the same problem as those regarding recruiting and enrollment.  In fact, statements that Capella recruits and enrolls

mostly high-quality students is simply the flip-side of the coin that it failed to disclose that it was enrolling unprepared students. The connection between such statements and Capella's financial success is too tenuous to provide the basis for a securities fraud action.

### (d)    Capella's Compliance With Title IV Requirements

With respect to the fourth type of allegedly fraudulent misrepresentations, that is, those regarding the school's compliance with the regulations governing eligibility for student financial aid programs, the ITT court noted that "the Complaint itself never alleges that [the school] was ever found to be in noncompliance at any point during the Class Period." Id. at *8. Moreover, to be misleading, allegations of such noncompliance must reflect "widespread problems of noncompliance throughout [the company's] many campuses and programs." Id. Because the regulations "do not prohibit or penalize incidents of such behavior," but rather only "set numerical thresholds for certain metrics, such as the maximum percentage of tuition revenue a school may draw from Title IV funding," "allegations of specific instances of unethical or fraudulent practices do not render Defendants' broad statements regarding compliance misleading." Id.

Here, although the Complaint alleges that Capella was not in compliance with certain existing regulations during the Class Period, it does not allege that the DOE, Congress, or any other oversight body had found Capella to be in such violation. As discussed above, the only determinations that Capella had been in violation of any regulation or standard pertain to the time before the Class Period. Rather, the Complaint attempts to suggest violations of Title IV by focusing on the issue of the DOE's changes,

21

and proposed changes, in the rules governing federal financial aid programs.  Throughout

the Class Period, at the quarterly conference calls, it became clear that the DOE was

considering various changes in its rules regarding a school's gainful employment rate and

loan repayment rate.  But Defendants were consistently clear that Capella was uncertain

as to what precise changes the DOE would eventually implement.  (Doc. No. 41, ¶ 132

("We are still in the early stages of the process . . . .  So as a result, it's difficult to express

a specific point of view about where the regulations will come out or what the detailed

implications will be to post-secondary institutions."), ¶ 136 ("Well I'll say here again, I

don't know if we want to get into speculating about that."), ¶ 138 ("I think it remains to

be seen what the final regulations are.").)  Because the fact that the DOE was considering

changes in the governing regulations was so well known, concerns as to whether existing

practices were sustainable could not have been due to any fraudulent omissions and

would apply to any for-profit institution engaging in similar practices, such as ITT

Educational Services, Inc.  In sum, any investor concerns about the sustainability of

Capella's financial success, even if directly traceable to practices that Capella might not

be able to sustain under the new regulatory framework, amount to little more than the

uncertainty about the future that any business faces.

In sum, the Complaint alleges that Capella engaged in undisclosed recruiting and

enrollment practices that, at most, might support a student's misrepresentation claim.

And if such allegations were to be substantiated, the Court does not suggest that it

condones such practices.  But the Court fails to see how not disclosing Capella's alleged

shift towards such practices could amount to securities fraud here.  In short, this Court does not discern any material omissions of fact that, had they been disclosed in a timely fashion, would have significantly altered the total mix of information available to investors.

### 2.    Scienter

In light of the Court's conclusion that the Complaint fails to plead any material omissions, the Court need not address the issues of scienter and loss causation. Nonetheless, the Court observes that Plaintiff's apparent theory of scienter–that Gilligan and his management team implemented the recruiting and enrollment practices in order to increase revenues and thus also the price of Capella's stock–is not sufficiently plausible, much less capable of supporting the requisite strong inference of scienter required by the PSLRA.

As noted above, the PSLRA imposes heightened pleading requirements with respect to not only the allegations of false or misleading statements, but also the allegations of scienter.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).  The Supreme Court has clarified that the scienter required for a Section 10(b) / Rule 10b-5 claim "refers to a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n.12 (1976).  Thus, negligence alone is not enough.  Id. at 201.  And if the alleged misstatement or omission is a "forward-looking statement," the "required level of scienter is 'actual knowledge.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1324 n.14 (2011) (quoting 15

U.S.C. § 78u-5(c)(1)(B)).

With respect to scienter, a plaintiff "must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Tellabs</u>, 551 U.S. at 313, 314 (quoting 15 U.S.C. § 78u-4(b)(2)). This standard requires more than a showing "that a reasonable fact-finder plausibly could infer from the complaint's allegations the requisite state of mind." <u>Id.</u> Rather, on a motion to dismiss, the court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." <u>Id.</u> In short, "an inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Id.</u>

In evaluating the sufficiency of the allegations, "courts must consider the complaint in its entirety," inquiring "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Id.</u> at 322-23 (emphasis in original). And in determining whether allegations "give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Id.</u> at 323. In other words, the elevated statutory standard does not merely require that a plaintiff allege "facts from which an inference of scienter rationally *could* be drawn. Instead, Congress requires plaintiffs to plead with particularity facts that give rise to a 'strong'–*i.e.*, a powerful or cogent–inference." <u>Id.</u> (emphasis in original).

24

This "inquiry is inherently comparative," requiring the court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. at 323-24.  But "the inference of scienter must be more than merely 'reasonable' or 'permissible'–it must be cogent and compelling." Id. at 324.  Accordingly, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Here, the Complaint alleges that Capella's allegedly abusive practices instituted under Gilligan were financially successful, with Capella's enrollments having grown "by over 26% in 2009, and its revenues" having grown by over 23%."  (Doc. No. 41, ¶ 7.)  But it also alleges that because the students were unsuited for Capella's programs, "[t]hey were therefore far more likely and in fact did withdraw" before completing the minimum percentage of coursework required for Capella to be able to retain the Title IV funds.  (Id. ¶ 8.)  It is difficult to understand why Defendants would engage in such practices of enrolling unprepared students when, quite predictably, that lack of preparation *increased* the likelihood that a disproportionately greater number of them would withdraw too early for Capella to be able to retain their tuition.  As the Complaint itself alleges, "[a]s a result" of the large number of unprepared students, "many students dropped out soon after enrolling."  (Doc. No. 41, ¶ 92.)  Plaintiff further alleges that, unlike other educational

25

institutions that can absorb a reasonable amount of "midstream reduction in expected revenues" with only "a minimal impact on overall profitability," Capella

> had a high drop-out rate that presented severe risks to its revenue stream. Not only did student withdrawal affect the Company's ability to realize revenue for the portions of the programs the students did not attend, but to the extent Capella returned the withdrawn students' Title IV funds, student withdrawals also limited the Company's ability to recognize revenue for the courses the students did attend.

(Id.)[7]  Thus, the Court finds it difficult to believe that Defendants would have attempted to fraudulently inflate the price of Capella's stock by engaging in aggressive practices that not only would not increase Capella's revenues, but also might be self-defeating insofar as those practices only increased Capella's expenses because the time and effort expended to recruit such students would be wasted.

In sum, not only does Plaintiff's theory of Defendants' allegedly fraudulent motives for having shifted to an overly aggressive recruiting strategy not meet the PSLRA's heightened standard for pleading scienter, Plaintiff's theory does not satisfy the plausibility standard under Iqbal.

### 3.    Loss Causation

The Court also notes similar problems with respect to Plaintiff's theory of loss causation.  Plaintiff alleges that the "truth was revealed" by a series of events occurring

---

[7]    The Complaint alleges that, in order to conceal from investors the increased number of early student withdrawals, Defendants improperly recognized revenues from tuition that it should have refunded, and that Defendants "may have" accounted for these revenues by making an allowance for bad debt expense.  But as discussed above, Plaintiff's "bad debt expense" theory itself fails.  See supra § II.B.1(a) (explaining that bad debt expenses were increasing before Gilligan took over in 2009).

between August 3, 2010, when the GAO Report revealed that all fifteen of the colleges

the GAO had investigated had engaged in abusive and deceptive recruiting and

enrollment practices, and August 16, 2010, a period over which the price of Capella's

common stock fell 34.8%.  (Doc. No. 41, ¶¶ 12, 14.)  The biggest drop occurred after

Friday August 13, 2010, when the DOE revealed after the markets had closed that the

repayment rate on loans taken by Capella's students was only 40%.  (Id. ¶ 14.)

Defendants, however, claim that the Complaint does not satisfactorily allege loss

causation because it shows no causal connection between the alleged fraud and the drops

in Capella's stock price, that is, that it fails to explain how any of the information

disclosed "corrected any prior, potentially actionable misstatements by Defendants."

(Doc. No. 46, at 35-37.)  They contend that none of the events on which Plaintiff relies,

such as the GAO report and the Senate hearings, "even mentioned Capella, much less

contained information that would constitute a corrective disclosure."  (Doc. No. 55, at

12.)

"To adequately plead loss causation, the complaint must state facts showing a

causal connection between the defendant's misstatements and the plaintiff's losses."

McAdams v. McCord, 584 F.3d 1111, 1114 (8th Cir. 2009).[8]  But as the Supreme Court

---

[8]     Unlike the elements of material misrepresentations and scienter, which are subject to heightened pleadings standards imposed by the PSLRA, the pleading of loss causation is subject only to Rule 8(a)(2)'s requirement of a short and plain statement of the claim.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005) (assuming "that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss").  The PSLRA

(continued...)

has explained, a reduced stock price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342-43 (2005).[9]  Plaintiff thus must "show that the defendant's fraud–and not other events–caused the security's drop in price." Schaaf v. Residential Funding Corp., 517 F.3d 544, 550 (8th Cir. 2008).

Here, Defendants contend that the GAO's Report cannot be considered corrective because that report did not mention Capella and the GAO did not investigate Capella. Defendants argue that "disclosures of new industry-specific events do not suffice to plead loss causation."  (Doc. No. 46, at 36.)  For the same reasons, they assert that the August 6, 2010 announcement that the Senate had requested information from Capella revealed nothing evidencing fraud.  In addition, the Senate's report that was issued after the Class Period did not, Defendants contend, contain any specific information about Capella.

---

[8](...continued)

addresses loss causation, but simply provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4). Nonetheless, this requirement of pleading loss causation is still subject to the plausibility requirements imposed by Twombly and Iqbal.

[9]       The Court rejected the argument that a plaintiff may satisfy its loss-causation requirement simply by pleading that the stock price "'*on the date of purchase* was inflated because of the misrepresentation.'" Id. at 338.  In a fraud-on-the-market case, "[a]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Id. at 342.  Rather, a plaintiff must then show that revelation of the fraud "deflated" that price.

Finally, they argue that the DOE's release of loan repayment rates for the first time on

August 13, 2010 "cannot be considered revelatory of any fraud" because Defendants had

not previously disclosed a "withdrawal rate" or "loan repayment rate"–as the DOE did not

require such disclosures.  (Id. at 37.)  Defendants thus contend that the rates calculated by

the DOE did not exist until the end of the Class Period and cannot be used "to show how

Capella might fare under the then-proposed version of the 'gainful employment' rule,"

which, in any event, "never became effective."  (Id. at 22.)  Moreover, Defendants

contend that the rate for Capella was not corrective of anything they had said.

This Court concludes that the Complaint does not satisfactorily allege that

Capella's reduced stock price reflects anything other than "changed economic

circumstances, changed investor expectations, new industry-specific or firm-specific

facts, conditions or other events, which taken separately or together account for some or

all of that lower price."  Dura Pharmaceuticals, Inc., 544 U.S. at 342-43.  There's no

dispute that Capella's stock price fell upon the various disclosures at issue.  But those

disclosures did not reveal what Plaintiff alleges had been fraudulently omitted, that is,

that Capella's success was in fact due to it engaging in aggressive and abusive recruiting

and enrollment practices.  All of the disclosures concerned the for-profit educational

industry as a whole, and only one specifically mentioned Capella.  The stock price of

Capella, as well as the stock prices of others in the for-profit industry fell in reaction to

governmental announcements that signaled a likely change in the regulation of that

industry.  And such changes in the law, triggered by the government's dissatisfaction with

the for-profit education industry as a whole, are too attenuated from any disclosure of allegedly material information that Defendants omitted.

### C.    Count II:  The Section 20(a) Claim

In Count II of the Complaint, Plaintiffs allege that the Individual Defendants were controlling persons of Capella, such that they are liable under Section 20(a) of the Exchange Act of 1934.  (Doc. No. 41, ¶ 213.)  Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10b-5 "shall also be liable jointly and severally with and to the same extent as such controlled person is liable."  15 U.S.C. § 78t.  In other words, the statute generally subjects to liability "those who, subject to certain defenses, 'directly or indirectly' control a primary violator of the federal securities laws."  Lustgraaf v. Behrens, 619 F.3d 867, 873 (8th Cir. 2010).  A claim under Section 20(a) for control person liability is thus derivative of a primary claim, that is, "[c]ontrol-person claims are predicated on plaintiffs first establishing that a controlled person was a primary violator."  Cummings v. Paramount Partners, LP, 715 F. Supp. 2d 880, 907 (D. Minn. 2010); accord In re Hutchinson Technology, Ins. Sec. Litig., 536 F.3d 952, 957-58 (8th Cir. 2008) ("[A] Section 20 claim is derivative and requires an underlying violation of the 1934 Act.").

Because this Court has concluded that Count I does not survive Defendants' motion to dismiss, Plaintiffs' Section 20(a) claim also fails.

### D.    Leave To Amend

Finally, Plaintiff seeks leave to amend the Complaint.  (Doc. No. 53, at 46.)

Granted, "dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1357, at 733 (3d ed. 2004). But this rule is based on the "policy of deciding cases on the basis of the substantive rights involved rather than on technicalities," such that the plaintiff should "be given every opportunity to cure a formal defect in the pleading." <u>Id.</u> at 738. The defect here, however, is not merely "formal" or "technical." Moreover, Plaintiff articulates no additional or different allegations or claims that it would make. <u>In re NVE Corp. Sec. Litig.</u>, 527 F.3d 749, 752 (8th Cir. 2008) (affirming dismissal with prejudice where "appellants have not articulated any changes they wish to make, much less demonstrated how revision would address the numerous pleading deficiencies identified by the district court"). The Court thus denies the request for leave to amend.

## III.   ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' motion to dismiss [Doc. No. 45] is **GRANTED**;

2.      This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 1, 2012                                   <u>   s/ Susan Richard Nelson   </u>
                                                                SUSAN RICHARD NELSON
                                                                United States District Judge